UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSE HERNANDEZ; KEITH GURGUI; RASHETA BUNTING; KAREN LUXTON GOURGEY; DISABILITY RIGHTS NEW YORK; NATIONAL FEDERATION OF THE BLIND OF NEW YORK STATE, INC.; AMERICAN COUNCIL OF THE BLIND OF NEW YORK, INC.; and CENTER FOR INDEPENDENCE OF THE DISABLED, NEW YORK, | CASE NO:  1:20-Civ.-04003 (LJL)<br><br>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' SECOND MOTION FOR A PRELIMINARY INJUNCTION** |

Plaintiffs,

-against-

THE NEW YORK STATE BOARD OF
ELECTIONS, DOUGLAS A. KELLNER,
Co-Chair and Commissioner, ANDREW
SPANO, Commissioner, PETER S.
KOSINSKI, Co-Chair and Commissioner,
TODD D. VALENTINE, Co-Executive
Director, and ROBERT A. BREHM, Co-
Executive Director, in their official capacities
at the New York State Board of Elections.

Defendants.

| DISABILITY RIGHTS NEW YORK | DISABILITY RIGHTS ADVOCATES | BROWN GOLDSTEIN & LEVY, LLP |
|---|---|---|
| Amanda B. Pearlstein | Michelle Caiola | Eve Hill |
| Christina Asbee | Christina Brandt-Young | 120 E Baltimore Street, Ste. 1700 |
| 25 Chapel Street, Suite 1005 | 655 Third Avenue, 14th Floor | Baltimore, MD 21202 |
| Brooklyn, NY 11201 | New York, NY 10017 | Tel: (410) 962-1030 |
| Tel: (518) 512-4956 | Tel:  (212) 644-8644 | |

*Attorneys for Plaintiffs*

i

**Table of Contents**

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ............................................................................................... 3

    I.     Defendants Have the Power to Implement Accessible Absentee Voting Across the
State. ................................................................................................................................. 3

    II.    Voters' Experiences in the June Election Show the Need for a Purpose-Built,
Accessible Absentee Ballot System. ................................................................................ 3

    III.   Effective RAVBM Technology is Readily Available to Defendants. .......................... 7

    IV.   The COVID-19 Pandemic and New York Voting .......................................................... 9

ARGUMENT ................................................................................................................... 10

    I.     Plaintiffs Are Likely to Succeed on the Merits. ........................................................... 11

    II.    Plaintiffs Will Suffer Irreparable Harm in the Absence of Injunctive Relief ............... 12

    III.   The Balance of Hardships Weighs Heavily in Favor of Plaintiffs ................................ 14

    IV.   Emergency Injunctive Relief Will Advance the Public's Interest ................................. 15

CONCLUSION ................................................................................................................. 15

## Table of Authorities

**Cases**

*Connecticut Dep't of Envtl. Prot. v. O.S.H.A.*, 356 F.3d 226 (2d Cir. 2004) ............................... 13

*Credico v. New York State Bd. of Elections*, 751 F. Supp. 2d 417 (E.D.N.Y. 2010).................... 13

*eBay Inc. v. Mercexchange LLC.*, 547 U.S. 388 (2006) ................................................. 15

*Dillon v. New York State Bd. of Elections*, No. 05 Civ. 4766, 2005 WL 2847465 (E.D.N.Y. Oct.

    31, 2005) ......................................................................................... 13

*Green Party of New York State v. New York State Bd. of Elections*, 267 F. Supp. 2d 342

    (E.D.N.Y. 2003) .................................................................................. 13

*Hindel v. Husted*, 875 F.3d 344 (6th Cir. 2017) ......................................... 14

*Jolly v. Coughlin*, 76 F.3d 468 (2d Cir. 1996) ............................................ 13

*National Federation of the Blind, et al. v. Lamone, et al.*, 813 F.3d 494 (4th Cir. 2016) ........... 14

*Obama for Am. v. Husted*, 697 F.3d 423 (6th Cir. 2012)............................................ 15

*People of New York ex rel. Spitzer v. Cty of Delaware*, 82 F. Supp. 2d 12 (N.D.N.Y. 2000)...... 14

*Statharos v. New York City Taxi & Limousine Comm'n*, 198 F.3d 317 (2d Cir. 1999) .............. 13

*Tennessee v. Lane*, 541 U.S. 509 (2004)................................................................ 15

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) .......................................... 10

**Statutes, Regulations, and Orders**

42 U.S.C. § 12101(a)(3).............................................................................. 15

42 U.S.C. § 12101(b)(1) ............................................................................. 15

52 U.S.C. §§ 20301 et seq............................................................................ 7

N.Y. Const. art. II, § 7............................................................................... 13

N.Y. Elec. Law § 3-102 .............................................................................. 3

**Court Documents**

Kristic Declaration. ...................................................................................................... 4, 5, 6

Mayr Declaration. ............................................................................................................. 6

Parker Declaration. ...................................................................................................... 4, 5, 6

Second Blake Declaration. ............................................................................................. 7, 8, 9

Second Bunting Declaration. ............................................................................................... 5

Second Gurgui Declaration. .............................................................................................. 9, 13

Second Hernandez Declaration. ...................................................................................... 8, 9, 13

Second Luxton Gourgey Declaration. ............................................................................. 5, 8, 9

Young Declaration. ......................................................................................................... 4, 6

Zimnik Declaration. ............................................................................................................ 4

Dkt. 8-1 (Memorandum of Law in Support of Plaintiffs' Motion for Temporary Restraining
Order and Preliminary Injunction ) ......................................................................... 11, 12

Dkt. 26 (Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary
Injunction) ......................................................................................................................... 11

Dkt. 35 (Reply Memorandum of Law in Support of Plaintiffs' Motion for Temporary Restraining
Order and Preliminary Injunction) ............................................................................. 11, 12

Dkt. 38 (Stipulation of Settlement and Order for the Withdrawal of the Motion for Temporary
Restraining Order and Preliminary Injunction) .................................................................. 3, 4

## PRELIMINARY STATEMENT

On May 22, 2020, Plaintiffs filed a motion challenging Defendants' inaccessible Absentee Voting Program. The Parties entered into a stipulation on June 2, 2020 ("June stipulation") in which Defendants agreed that each county would make its existing, inaccessible electronic ballots for overseas voters accessible on request. This stipulation governed only the June 23, 2020 primary election. It did not apply to any elections thereafter. The June stipulation allowed Defendants to rely on the patchwork of County Boards of Elections ("CBOEs") to remediate pre-existing inaccessible ballots, and only upon a voter's request. Unfortunately, voters with print disabilities attempting to exercise their rights through this ad hoc process encountered confusion at the CBOEs, poorly formatted documents, and continued difficulty voting absentee.

The COVID-19 pandemic shows no signs of significantly abating before the November general election. Much higher turnout is likely, and absentee voting will remain an important way for voters to cast their ballots without risking the danger in-person voting poses to their health and lives. Plaintiffs seek through this Motion to require Defendants to implement an effective and purpose-built Remote Accessible Vote-by-Mail ("RAVBM") system for use across New York State for the November 3, 2020 election.[1] If Defendants act promptly pursuant to their

---

[1] Plaintiffs express no opinion regarding whether the state should offer more than one RAVBM from which counties may select, as Ohio and California do, Frank LaRose, *Remote Ballot Marking System Map* (2019), ftp://sosftp.sos.state.oh.us/free/publications/website/maps/ RemoteBallotMarkingSystem.pdf; Cal. Sec'y State, *Remote Accessible Vote-By-Mail*, https://votingsystems.cdn.sos.ca.gov/vendors/ravbm-faq2.pdf, or offer one RAVBM that is compatible with all the voting systems used by the counties, as Maryland and Delaware do, *Access by Voters with Disabilities*, Md. State Bd. Elections, https://elections.maryland.gov/voting/ accessibility.html (last visited July 21, 2020); *Accessible Voting Available for July 7th Presidential Primary*, Delaware.gov (July 1, 2020), https://news.delaware.gov/2020/07/01/accessible-voting-available-for-july-7th-presidential-primary (last visited July 24, 2020).

oversight duty under the New York Election Law, one or more effective RAVBM systems can be procured, tailored to meet the needs of Defendants and the CBOEs, and made available to more functionally serve Plaintiffs and their members.

Many Plaintiffs and organizational members faced substantial challenges when attempting to cast their votes on June 23 using the ad hoc, remediated ballots. Under the June stipulation, each CBOE could, and did, act independently from each other and Defendants, without the benefit of shared experience and coordination. The CBOEs relied on their own resources and devices to attempt to make existing ballots accessible one at a time, without necessarily engaging with any person or entity with expertise in the technical side of accessible absentee voting.

Because Defendants did not put into place a purpose-built RAVBM system to provide ballots that were designed to be accessible, the CBOEs took wildly different approaches, leading to a variety of errors. For example, the Albany BOE's remediated absentee ballot for the Democratic Presidential Primary failed to match the delegates to their assigned presidential candidates. The Monroe BOE's staff gave voters misinformation. Several voters had difficulty printing the NYC BOE accessible ballot because it could not be saved as a Portable Document File ("PDF").

If voters with print disabilities are going to have a reliable option to vote absentee in November, Defendants must avoid the problems that arose in June. A RAVBM system can produce accessible ballots for every potential voter in advance, rather than try to remediate existing documents after a request is made. It can ensure that the ballots are compatible with all of the common assistive software and operating systems used by people with print disabilities. It can deliver the ballots electronically to voters with print disabilities and allow them to

electronically mark their ballots. New York can choose between several of these RAVBM systems, which are fast to implement, cost-effective or free, and used by many states and localities across the country.

## STATEMENT OF FACTS

I.     **Defendants Have the Power to Implement Accessible Absentee Voting Across the State.**

Given the difficulties encountered in the June primary, described below, a professional, purpose-built system is necessary to reliably provide accessible absentee ballots statewide. Implementing, or requiring CBOEs to implement, such a system is well within the duties and powers of the State Board of Elections. New York Election Law provides that the State Board of Elections "shall have the power and duty" to "1. Issue instructions and promulgate rules and regulations relating to the administration of the election process" and "2. Visit [local] boards of elections, examine their procedures and records and direct that any such procedures be modified in any manner consistent with the provisions of this chapter." N.Y. Elec. Law § 3-102. The State Board of Elections cannot leave ADA compliance in the Absentee Voting Program to the discretion of the counties.

II.    **Voters' Experiences in the June Election Show the Need for a Purpose-Built, Accessible Absentee Ballot System.**

On June 2, 2020, in response to Plaintiffs' initial filings, Defendants agreed to instruct the CBOEs to make their existing electronic PDF ballots accessible and fillable upon request from individuals with print disabilities for the June 23, 2020 election. Dkt. 38. The CBOEs in New York's 62 counties were tasked with carrying out much of the Stipulation: providing the accessible absentee ballot request form on their respective websites, processing accessible absentee ballot requests, and delivering and receiving accessible absentee ballots. *Id.* ¶ 3. The

CBOEs were responsible for remediating their PDF ballots to be screen-readable with common assistive technology such as Job Access with Speech ("JAWS"), Apple VoiceOver, and Android TalkBack, and for ensuring that the ballots met Web Content Accessibility Guidelines ("WCAG") 2.0 AA standards. *Id.* ¶ 11.

Despite the requirements of the June stipulation, CBOEs across the state did not make the changes necessary to ensure their absentee ballots were sufficiently accessible for voters with print disabilities to use them privately and independently. As a result, some voters gave up entirely and had someone else fill out the ballot for them, *see* Parker Decl. ¶¶ 12–14, or they had to use multiple websites and technologies to decode the ballot, taking far more time and effort than nondisabled voters must use, *see* Kristic Decl. ¶¶ 11–13. Other voters contended with CBOEs that believed that accessible absentee voting did not exist. Young Decl. ¶¶ 12–13, 15.

These problems were not the result of user error. For example, the National Federation of the Blind analyzed the Albany County presidential primary ballot received by one blind voter. Zimnik Decl. ¶ 4. It determined that the ballot was inaccessible because its reading order was not configured logically, and the individual cells in the ballot did not provide sufficient identifying information for the voter to understand their selection. *Id.* ¶¶ 11–21.

The June stipulation envisioned that absentee ballots would be distributed as accessible, fillable PDFs. Dkt. 38 ¶ 11. PDF ballots can be printed and returned by mail, as Defendants required. However, some jurisdictions, such as New York City, produced accessible ballots in HTML (webpage) format. While HTML format has many accessibility benefits across different types of assistive technology, operating systems, and web browsers, unless it is properly coded, it may not save and print in a layout similar to a PDF or Word document, because web pages are

generally formatted for a computer display without the limits of paper size, margins, and frames. Second Luxton Gourgey Decl. ¶¶ 12–14.

The following examples illustrate some of the burdens the ad hoc system imposed on voters with print disabilities. Plaintiff Karen Luxton-Gourgey, a voter in New York City, was able to access an electronic absentee ballot, but the ballot was not and could not be formatted as a PDF file that she could save and transfer to a computer hooked up to a printer. *Id.* ¶ 13. Dr. Luxton Gourgey called the New York City BOE, but they could not assist her. She ultimately had to rely on her husband's assistance to vote, sacrificing the privacy and independence that make a voting system accessible. *Id.* ¶ 13.

Plaintiff Rasheta Bunting, also a New York City voter, was not able to obtain an accessible absentee ballot at all. She downloaded Adobe Acrobat to fill out the application, but the application was not formatted to be compatible with her screen reader, VoiceOver. Second Bunting Decl. ¶ 5. Her screen reader read the entire document every time Ms. Bunting typed a letter. As a result, it took Ms. Bunting over an hour to fill out the application. *Id.* ¶ 9. She nevertheless managed to submit her application for an accessible absentee ballot on June 12, 2020. *Id.* Ms. Bunting never received an accessible absentee ballot from the CBOE. She was forced to go to the polls in order to vote privately and independently—a situation she had been determined to avoid due to the threat of COVID-19. *Id.* ¶¶ 12–14.

Two blind voters in Albany County, both members of Plaintiff American Council of the Blind of New York ("ACB-NY"), also received ballots that were not formatted to be accessible with their screen reader software, JAWS. Parker Decl. ¶ 11; Kristic Decl. ¶ 11. Among other issues, the ballot did not read any information connecting the delegates with their parties and candidates. Parker Decl. ¶ 12; Kristic Decl. ¶ 12. Ms. Parker had to use sighted assistance to cast

her ballot. Parker Decl. ¶14. Ms. Kristic, who eventually figured out her ballot through a painstaking process of cross-checking and referencing using multiple technologies, nonetheless asked a sighted person to double-check the accuracy of her completed ballot, because the ballot was too inaccessible for her to have confidence in her vote. Kristic Decl. ¶¶ 15–16.

In Suffolk County, a legally blind voter and member of Plaintiff National Federation of the Blind of New York ("NFB-NY"), could not independently complete the application process for an accessible absentee ballot because the application was inaccessible to her screen reader, VoiceOver. Mayr Decl. ¶¶ 8–11. Once she submitted the application with the assistance of her husband, the voter received a call from the Suffolk County BOE informing her that they could not open the file. Upon resubmitting the application, the CBOE explained that the application appeared blank on the computer but became visible when printed. *Id.* ¶ 14. When the voter finally received her ballot, VoiceOver could not read out which candidate was associated with which check box, and the voter again had to rely on her husband to fill out the ballot. *Id.* ¶¶ 15–16.

In Monroe County, a blind voter and NFB-NY member contacted the Monroe County BOE on June 8, 2020, to request an accessible absentee ballot. The CBOE representative vehemently denied the existence of an accessible absentee ballot option. Young Decl. ¶ 12. The voter called the CBOE again on June 12, 2020, and met with similar resistance. *Id.* ¶ 13. The voter ultimately received three ballots—two paper and one electronic. When he called the CBOE to ask whether he should shred the two extraneous ballots, they again said that they did not know what he meant by an electronic ballot. *Id.* ¶ 15.

These issues in Albany, Suffolk, and Monroe Counties and New York City are representative of problems that were reported to Plaintiffs. While Plaintiffs addressed these

issues with Defendants as they arose, it was and is clear that the ad hoc solution led to a great deal of confusion and frustration for voters and CBOEs and was ultimately inadequate to meet the ADA's standards.

## III.   Effective RAVBM Technology is Readily Available to Defendants.

Remote, electronic ballot delivery and marking tools exist for voters and are used by Boards of Elections as alternatives to paper ballots across the country.  New York State previously implemented a statewide electronic ballot delivery system called Scytl,[3] pursuant to its responsibility under the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), 52 U.S.C. §§ 20301 *et seq*. These systems "ensure electronic ballots are made accessible in advance of a request and ensure the ballots' accessibility is tested with the most commonly-used assistive technologies, as well as with various combinations of assistive technology, operating systems and web browsers." Second Decl. of Lou Ann Blake. ¶ 26. Ballots can be complex in their layout and formatting, and purpose-built voting vendors are skilled in conveying that ballot information to voters nonvisually.  They are more effective than the ad hoc system Defendants used for the June primary. "Because the purpose-built remote accessible vote-by-mail systems deal specifically and routinely with elections, they understand the common issues that can inhibit accessibility and know how to avoid them. These companies have extensive experience formatting ballots for screen readers and screen reader users report few accessibility problems [with] ballots provided through these systems." *Id.* ¶ 27.

---

[3] "Scytl Online Voting enables voters to cast their vote privately and easily from any location and on any device with Internet access (PC, tablet, smartphone, etc.), ensuring maximum election engagement by enabling remote and disabled voters to participate on equal terms." *Online Voting*, Scytl, https://www.scytl.com/en/online-voting (last visited July 18, 2020).

Several purpose-built RAVBM systems are available to New York State. Prime III,[4]

Democracy Live,[5] and Maryland's online ballot marking system[6] are a few of the systems

immediately available to Defendants. These systems allow voters to access their absentee ballots

through their web browser and read and mark their ballots on their computers or devices using

assistive technology, such as screen magnification or screen reading software. Voters then either

print their ballots and mail them back to their local boards of elections, or return them by email,

fax, or online, to be counted. *Id.* ¶¶ 14–21. These tools have been tested across assistive

technologies, operating systems, and web browsers, certified as meeting voting security

standards, and successfully used by individuals with print disabilities to vote independently and

privately in elections held across the country. *Id.* ¶¶ 19–21. They can be implemented in time for

the November election. *Id.* ¶ 25.

Defendants have the resources to implement any of these systems. This year, through the

CARES Act, New York received $20.5 million in funds specifically to assist with changes to its

voting systems arising from the COVID-19 pandemic, including, specifically, changes to

---

[4] Prime III is used in Ohio. Second Blake Decl. ¶ 23.

[5] At least 15 states and many local boards of elections across the country have certified the Democracy Live voting system for use in elections. *Approvals, Reviews, and Certifications*, Democracy Live, https://democracylive.com/approvals-reviews-and-certifications (last visited July 22, 2020). Democracy Live's system has been "[s]elected by the Department of Defense to assist military voting" and is "a member of the Department of Homeland Security sponsored Elections Coordinating Council[.]" *Our Company*, Democracy Live, https://democracylive.com/our-company (last visited July 22, 2020). It appears that the New York City BOE used Democracy Live for its accessible absentee ballot in the June 2020 primary. Aside from not offering a printer-friendly option in the version used by the City, Democracy Live made ballot reading and marking easy for these voters. *See* Second Luxton Gourgey Decl. ¶ 11; Second Hernandez Decl. ¶¶ 12–15. Democracy Live can make a printer-friendly absentee ballot available.

[6] The state of Maryland developed its own online ballot marking system, which it has used successfully since 2014.

improve and increase absentee voting.[7] This is in addition to approximately $22 million the state received in 2020 HAVA Election Security Funding.[8]

Prime III and Maryland's online ballot marking tool can be used by Defendants free of charge. Second Blake Decl. ¶¶ 18–19. In addition, foundations such as Tusk Philanthropies are ready and willing to directly assist states with the funding and implementation of RAVBMs.[9]

## IV.    The COVID-19 Pandemic and New York Voting.

As of July 23, 2020, more than 413,595 people in New York State had been infected with COVID-19, and 32,228 had lost their lives to the disease.[10] Many people with disabilities are at a heightened risk of contracting the COVID-19 infection.[11] This risk is particularly acute for Plaintiffs with medical conditions that make them at high risk of COVID-19 infection or of severe illness from infection.[12] Second Gurgui Decl. ¶¶ 10–11; Second Hernandez Decl. ¶ 8. In addition, blind individuals, such as Plaintiffs Luxton Gourgey and Bunting and members of

---

[7] *2020 Cares Act Grants*, Election Assistance Comm'n, https://www.eac.gov/payments-and-grants/2020-cares-act-grants (last visited July 24, 2020).

[8] *Funding Levels by State*, Election Assistance Comm'n, https://www.eac.gov/funding-levels-by-state (last visited July 24, 2020).

[9] Tusk Philanthropy Mobile Voting Project has successfully completed fifteen mobile voting pilot projects in Colorado, Oregon, Utah, Washington, and West Virginia. *Mobile Voting Project*, Tusk Philanthropies, https://mobilevoting.org (last visited July 23, 2020).

[10] *New York Coronavirus Map and Case Count*, N.Y. Times, https://www.nytimes.com/interactive/2020/us/new-york-coronavirus-cases.html (last visited July 23, 2020).

[11] *See Coronavirus Disease 2019 (COVID-19): People with Disabilities*, Ctrs. for Disease Control & Prevention ("CDC"), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-disabilities.html (last visited July 23, 2020).

[12] *People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited July 23, 2020).

NFB-NY and ACB-NY, may need to use public transportation, taxis, or ride-hailing services to reach their polling places, subjecting them to an increased risk of infection.[13]

Researchers and epidemiologists warn that a second outbreak, or "second wave," of COVID-19 is imminent for New York.[14] Governor Cuomo will likely prepare New Yorkers for the November election as he did through Executive Orders in April 2020.[15] If Defendants do not put into place an accessible absentee voting program for the November election, Plaintiffs will be forced to go out into the community to vote in person, vote by paper absentee ballot by asking someone to read and/or mark their ballot—thus forfeiting their right to vote privately and independently—or forfeit their right to vote altogether.

## ARGUMENT

To succeed on a preliminary injunction motion, a plaintiff must establish four factors: 1) that he is likely to succeed on the merits; 2) that he is likely to suffer irreparable harm in the absence of preliminary relief; 3) that the balance of equities tips in his favor; and 4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Plaintiffs have successfully established these factors and are entitled to preliminary relief.

---

[13] *What Rideshare, Taxi, Limo, and other Passenger Drivers-for-Hire Need to Know About COVID-19*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/rideshare-drivers-for-hire.html (last visited July 23, 2020).

[14] Luis Ferré-Sadurní & Nate Schweber, *New York Confronts Second-Wave Risk: Visitors From Florida and Texas*, N.Y. Times (July 20, 2020), https://www.nytimes.com/2020/07/14/nyregion/coronavirus-ny-travel-cuomo.html (last visited July 23, 2020).

[15] In recognition of the risk of spread of COVID-19, New York's Governor Andrew Cuomo issued a number of Executive Orders relating to voting in the 2020 Primary Elections, including postponing the presidential primary race, advancing access to the absentee voting program for all New York voters, and making the accessible voting machine available at every BOE by appointment.

## I.      Plaintiffs are Likely to Succeed on the Merits.

Plaintiffs are likely to succeed on the merits of their claims under Title II of the

Americans with Disabilities Act, 42 U.S.C. §§ 12131–12134 ("ADA" or "Title II") and Section

504 of the Rehab Act, 29 U.S.C. § 794 ("Section 504"). Plaintiffs have successfully

demonstrated the three prongs for success on the merits under the ADA and Section 504: (1) they

are "qualified individuals" with disabilities; (2) Defendants are subject to the relevant laws; and

(3) Plaintiffs will be denied the opportunity to participate equally in or benefit equally from

Defendants' services, programs or activities—in this case, voting privately and independently via

absentee ballot—by reason of their disabilities. *See Henrietta D. v. Bloomberg*, 331 F.3d 261,

272 (2d Cir. 2003).

Defendants have never argued that Plaintiffs are not qualified individuals with

disabilities, as Plaintiffs clearly are. *See generally* Opp'n Mot. Prelim. Inj. Dkt. 26. They have

contended only that Plaintiffs are not entitled to the "convenience" of an accessible absentee

voting program. *See id.* at 11. As discussed in Plaintiffs' briefing in support of their first motion

for preliminary injunctive relief, Dkts. 8-1, 35, Defendants must ensure equally effective

communications with members of the public with disabilities, 28 C.F.R. § 35.160(a)(1). A voting

program that requires some voters with disabilities to spend an hour applying for an absentee

ballot; to cross-reference across multiple technologies to mark a ballot; to explain the accessible

voting system to their own Board of Elections; or to rely on the assistance of others, is not

equally effective. Defendants must do more than provide "merely the opportunity to vote at some

time and in some way." *Disabled in Action v. Bd. of Elections in City of N.Y.*, 752 F.3d 189, 199

(2d Cir. 2014). "The right to vote should not be contingent on the happenstance that others are

available to help." *Id.* at 200. Nor should it be contingent on the voter's willingness to risk their

health or their lives—and the health and lives of loved ones.

The ADA prohibits government action that "burdens visually-impaired persons in a manner different and greater than it burdens others." *Crowder v. Kitagawa*, 81 F.3d 1480, 1484 (9th Cir. 1996). So long as Defendants' Absentee Voting Program imposes burdens on Plaintiffs that others need not bear, and so long as "Defendants fail […] to undertake some feasible measure to improve accessibility"—*i.e.*, so long as auxiliary aids and services are available— Defendants violate the ADA. *United Spinal Ass'n v. Bd. of Elections in City of N.Y.*, 882 F. Supp. 2d 615, 626 (S.D.N.Y. 2012), *aff'd sub nom. Disabled in Action*, 752 F.3d 189.

As the substantive legal issues presented in this case remain unchanged since the briefing on Plaintiffs' first motion for preliminary injunctive relief, for purposes of judicial efficiency, Plaintiffs refer to their Memorandum, Dkt. 8-1, at 12–18, and Reply, Dkt. 35, at 2–6, in support of that motion for further legal analysis regarding their likelihood of success on the merits.

## II.   Plaintiffs Will Suffer Irreparable Harm in the Absence of Injunctive Relief

The harm to Plaintiffs absent the requested relief is both imminent and irreparable. The threat of contracting COVID-19 by voting in-person on November 3, 2020, or during early voting poses serious and life threatening consequences to Plaintiffs.[16] Plaintiffs face grave risk to their health by voting at the polls, while others are permitted, and strongly encouraged, to avoid

---

[16] The threat at polling locations is real. Wisconsin held in-person elections on April 7, 2020, resulting in multi-hour waits to enter poll sites in Milwaukee and Green Bay. Despite outcry and known health risks, Wisconsin leaders refused to make absentee voting available to all voters. By April 24, health officials in Milwaukee had identified at least 40 positive COVID-19 cases linked to in-person voting on April 7, including at least six voters and one poll worker. Teran Powell, *40 Coronavirus Cases In Milwaukee County Linked To Wisconsin Election, Health Official Says*, WUWM 89.7 Milwaukee's NPR (Apr. 24, 2020), https://www.wuwm.com/post/40-coronavirus-cases-milwaukee-county-linked-wisconsin-election-health-official-says#stream/0. By April 30, 52 people who voted in-person or worked as poll workers in the April 7 Wisconsin primary had tested positive for COVID-19. Scott Bauer, *52 People Who Worked or Voted in Wisconsin Election Have COVID-19*, PBS News Hour (Apr. 29, 2020), https://www.pbs.org/newshour/health/52-people-who-worked-or-voted-in-wisconsin-election-have-covid-19.

that risk by limiting exposure to the community. *See* Second Gurgui Decl. ¶¶ 10–11; Second Hernandez Decl. ¶ 8; Bunting Decl. ¶¶ 10–11. By depriving Plaintiffs of access to an accessible electronic ballot, Defendants force Plaintiffs to make a choice: to prioritize their fundamental right to vote over their health and well-being, or to give up their right to vote privately and independently.

Plaintiffs have also demonstrated irreparable harm because they have alleged that because of their disabilities, they are being deprived of a reasonable opportunity to exercise their constitutional right to vote. "[T]he alleged violation of a constitutional right triggers a finding of irreparable injury." *Conn. Dep't of Envtl. Prot. v. O.S.H.A.*, 356 F.3d 226, 231 (2d Cir. 2004).[17] The New York Constitution guarantees the right to vote, including the right to a secret ballot. N.Y. Const. Art. II, § 7. Courts in this circuit have consistently found irreparable injury in matters where voters have alleged violations of their right to vote.[18]

The injuries caused by Defendants' acts and omissions in this case are not remote or speculative; they are actual and imminent. The individual Plaintiffs have attested to the injuries caused by the unlawful barriers maintained by Defendants. Further, the organizational Plaintiffs represent thousands of additional New Yorkers who are eligible voters and face the same barriers

---

[17] *See also Statharos v. N.Y.C. Taxi & Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999) ("Because plaintiffs allege deprivation of a constitutional right, no separate showing of irreparable harm is necessary."); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (clarifying that "it is the alleged violation of a constitutional right that triggers a finding of irreparable harm" and a substantial likelihood of success on the merits of a constitutional violation is not necessary).

[18] *See*, e.g., *Green Party of N.Y. State v. N.Y. State Bd. of Elections*, 267 F. Supp. 2d 342, 351 (E.D.N.Y. 2003), *modified*, No. 02-CV-6465 (JG), 2003 WL 22170603 (E.D.N.Y. Sept. 18, 2003), *and aff'd,* 389 F.3d 411 (2d Cir. 2004) ("The plaintiffs have satisfied the [irreparable harm] prong of the test by alleging" that aspects of New York's voter enrollment scheme violated "their First and Fourteenth Amendment rights to express their political beliefs, to associate with one another as a political party, and to equal protection of the law."); *see also Credico v. N.Y. State Bd. of Elections*, 751 F. Supp. 2d 417, 420 (E.D.N.Y. 2010); *Dillon v. N.Y. State Bd. of Elections*, No. 05 Civ. 4766, 2005 WL 2847465, at *3 (E.D.N.Y. Oct. 31, 2005).

because they cannot read or mark paper ballots privately and independently. Over 400,000 New

Yorkers identify as having a vision disability alone. *See Disability Characteristics*, U.S. Census

Bureau (2018) American Community Survey, https://data.census.gov/cedsci/table?tid=

ACSST5Y2018.S1810&y=2018&t=Disability&vintage=2018&hidePreview=true&layer=VT_20

18_050_00_PY_D1&cid=S1810_C01_001E&g=0400000US36. "These figures are too large to

ignore, especially in light of the fact that the prospective harm is great and compliance with the

ADA, *et al.*, is mandatory. Plaintiffs have shown irreparable harm." *People of New York ex rel.

Spitzer v. County of Delaware*, 82 F. Supp. 2d 12, 17 (N.D.N.Y. 2000).

### III.     The Balance of Hardships Weighs Heavily in Plaintiffs' Favor.

Granting the preliminary relief Plaintiffs seek will cause no substantial hardship to

Defendants and will greatly benefit Plaintiffs. Circuit courts have already determined that

implementing an online ballot marking tool does not cause a fundamental alteration of absentee

voting programs. *See Nat'l Fed. of the Blind v. Lamone*, 813 F.3d 494 (4th Cir. 2016); *Hindel v.

Husted*, 875 F.3d 344 (6th Cir. 2017).

Accessible absentee voting systems are readily available, some at low or no cost. This

year alone, through the CARES Act, New York received $20.5 million in funds to assist with

changes to its voting systems arising from the COVID-19 pandemic, including, specifically,

absentee voting. Numerous other jurisdictions across the country have successfully used

RAVBM systems for years. New York City's BOE already used a RAVBM system, Democracy

Live, for absentee ballots in the June election (although did not implemented the available

features required to guarantee a printable absentee ballot).

Defendants should share Plaintiffs' interest in a consistent accessible absentee voting

tool. It will result likely in less work for Defendants and CBOEs than the June 2020 election,

during which Defendants and the CBOEs consistently had to respond to voter inquiries and troubleshoot problems that they lacked the expertise to solve.

## IV.    Emergency Injunctive Relief Will Advance the Public's Interest.

Courts must ensure that "the public interest would not be disserved" by the issuance of a preliminary injunction. *eBay Inc. v. Mercexchange LLC.*, 547 U.S. 388, 391 (2006). Congress made clear in enacting the ADA that the public interest lies in the eradication of discrimination against persons with disabilities, declaring that the ADA's purpose is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." *Tennessee v. Lane*, 541 U.S. 509, 516 (2004) (*quoting* 42 U.S.C. § 12101(b)(1), (b)(4)). In passing the ADA, Congress found that discrimination against people with disabilities occurs in such "areas as . . . voting, and access to public services[.]" 42 U.S.C. § 12101(a)(3). Additionally, "the public has a strong interest in exercising the 'fundamental political right' to vote . . . . The public interest therefore favors permitting as many qualified voters to vote as possible." *Obama for Am. v. Husted*, 697 F.3d 423, 436–37 (6th Cir. 2012).

If Plaintiffs' requested relief is granted, there will be no negative impact on the public interest, as the public only benefits from more New Yorkers having access to the vote and from Defendants complying with the ADA. The requested relief is essential to a functional and fair democratic society. The requested injunctive relief will ensure Defendants do not violate Plaintiffs' constitutionally protected civil right to vote privately and independently.

## CONCLUSION

Absent the preliminary injunctive relief sought through this Motion, Plaintiffs and their members face the very real prospect of being totally excluded from the voting process, being forced to sacrifice their right to vote privately, or being put at risk of serious illness or death if

forced to vote at the polls instead of by absentee ballot. Accordingly, Plaintiffs respectfully request that this Honorable Court grant their Motion for Preliminary Injunction and order Defendants make the Absentee Voting Program accessible to voters with print disabilities by implementing a purpose-built remote accessible absentee voting system statewide in time for the November 3, 2020 election.

DATE: July 24, 2020
Brooklyn, NY

By:  /S/ Amanda B. Pearlstein____

Amanda B. Pearlstein
Christina Asbee
DISABILITY RIGHTS NEW YORK
25 Chapel Street, Suite 1005
Brooklyn, NY 11201
Phone:  518-512-4841
Fax:  518-427-6561 (not for service)
Amanda.Pearlstein@drny.org
Christina.Asbee@drny.org

Michelle Caiola
Christina Brandt-Young
DISABILITY RIGHTS ADVOCATES
655 Third Avenue, 14th Floor
New York, NY 10017
Tel:  (212) 644-8644
Fax:  (212) 644-8636
mcaiola@dralegal.org
cbrandt-young@dralegal.org

Eve Hill
Brown Goldstein & Levy, LLP
120 E. Baltimore Street, #1700
Baltimore, MD, 21202
Tel.: (410) 962-1030
Fax: (410) 385-0869
EHill@browngold.com

skw@browngold.com

*Attorneys for Plaintiffs*