UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                                                  :
JOSE HERNANDEZ, ET AL,                                            :
                                                                  :
                                    Plaintiffs,                   :
                                                                  :
                                                                  :          20-cv-4003 (LJL)
                    -v-                                            :
                                                                  :          OPINION &
NEW YORK STATE BOARD OF ELECTIONS, ET AL,                         :          ORDER
                                                                  :
                                    Defendants.                   :
                                                                  :
------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Plaintiffs move for a preliminary injunction requiring Defendants to implement an

effective and purpose-built Remote Accessible Vote-by-Mail ("RAVBM") system for use by

persons with disabilities across New York State when they vote in the November 3, 2020

election.  For the following reasons, the preliminary injunction is denied.

## BACKGROUND

      The plaintiffs in this lawsuit ("Plaintiffs") challenge the New York State Board of

Elections ("NYS BOE") and, in their official capacities, its Commissioners and Co-Executive

Directors (together with the NYS BOE, "Defendants") for operating an absentee voting program

that is inaccessible to New Yorkers with disabilities.  Plaintiffs are individuals and organizations.

The individuals ("Individual Plaintiffs") are voters who, due to print disabilities, are unable to

independently mark a paper ballot.  The organizations ("Organizational Plaintiffs") are advocacy

groups whose missions are to support people with disabilities.  Plaintiffs bring their claims under

Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12131 *et seq.* ("ADA" or

"Title II") and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.*

("Rehabilitation Act" or "Section 504").

In September 2019, the President of the National Federation of the Blind submitted a letter to Defendants advising them that "the right of many absentee voters with disabilities to mark their ballots privately and independently continues to be denied due to the implementation of inaccessible systems that require them to depend on others to assist them in the ballot-marking process." (Dkt. No. 8, Ex. A.)  "In advance of the 2020 elections," the letter continued, "I am writing to remind you of your obligation, as required by federal law and recent court decisions, to provide voters with print disabilities an accessible way to privately and independently mark an absentee ballot." (*Id.*)  The letter advised Defendants of "a number of accessible absentee ballot-marking systems available for use" including the Maryland State Board of Elections's tool ("available at no charge"), Five Cedars, Democracy Live, Dominion Voting, and Prime III. (*Id.*) The letter "strongly encourage[d]" Defendants to implement such a system for use in the 2020 elections. (*Id.*)  Defendants did not respond. (Dkt. No. 1 ¶ 93.)

In April and May of 2020, Plaintiffs' counsel held a series of virtual roundtable discussions with New Yorkers regarding absentee voting and accessibility. (*Id.* ¶ 95.)  By that time, New York City was the epicenter of the COVID-19 pandemic in the United States. Accordingly, New York's Governor, Andrew Cuomo, issued a series of executive orders related to absentee voting.

On March 7, 2020, Executive Order 202 declared a disaster emergency for the entire State of New York.  On April 9, 2020, Governor Cuomo issued Executive Order 202.15, providing that, "due to the prevalence and community spread of COVID-19, an absentee ballot [that] can be granted based on 'temporary illness'" (which, under regular circumstances, entitles an individual to vote absentee) could be granted under circumstances where "temporary illness"

2

includes "the potential for contraction of the COVID-19 virus for any election held on or before June 23, 2020." On April 24, 2020, Governor Cuomo issued Executive Order 202.23, which provided that all eligible voters would be "sent an absentee ballot application form with a postage paid return option for such application," in addition to having any other ballot request options then available (telephonic, electronic, or via Internet). On May 1, 2020, Governor Cuomo issued Executive Order 202.26, which stated that "the board of elections shall provide and maintain, in its office, a voting system that is accessible for voters wishing to mark their ballot privately and independently, and provided that availability of this service shall be posted on the website of each board of elections."

On May 5, 2020, Plaintiffs' counsel requested that Defendants implement an online absentee ballot delivery and marking system and a consistent protocol for requesting disability accommodations in advance of the June 23, 2020 election. (Dkt. No. 8, Ex. C.) On May 15, 2020, Plaintiffs' counsel wrote a follow-up letter. (*Id.*, Ex. F.) On May 19, 2020, Defendants responded by letter, stating: "In relation to 'at home' ballot marking for voters with disabilities, [NYS BOE] is currently working on solutions that are consistent with New York law and that address various security concerns." (*Id.*, Ex. G.) The following day, Defendants' counsel informed Plaintiffs' counsel that, for the June 23, 2020 election, voters with print disabilities who needed an accommodation to vote privately and independently would have to visit a local board of elections if they wanted to mark their paper absentee ballot using a ballot marking device ("BMD"). (Dkt. No. 1 ¶ 101.)[1] BMDs provide accessibility features for voters with print

---

[1] The allegations in the Complaint regarding these communications were not contradicted.
[2] The Court also ensured that no party objected to the hearing being conducted telephonically with the presiding judge located outside the District. (Dkt. Nos. 85, 90.)
[3] Plaintiffs asked the Court to take judicial notice of additional evidence in their letter. (Dkt. No. 96.) That request is improper and the Court will not receive the evidence. The evidence, which

disabilities, but only if they travel in person to a board of elections office or polling place.  (*Id.* ¶ 60; Dkt. No. 8, Ex. G.)  Upon Plaintiffs' belief, Defendants were offering no accessible means for voters with print disabilities to receive, mark, or submit an absentee ballot privately and independently from home.  (Dkt. No. 1 ¶ 62.)   In other words, Plaintiffs and their members would be forced into "the position of choosing between their fundamental right to a private and independent vote and their personal health and safety."  (Dkt. No. 8 at 3.)

Plaintiffs filed their Complaint on May 22, 2020.  (Dkt. No. 1.)  The same day, Plaintiffs moved for a preliminary injunction requiring Defendants to immediately provide an electronic ballot marking system for the upcoming elections.  (Dkt. No. 8.)  Plaintiffs' preliminary injunction motion identified accessible PDF ballots as one such marking system.  At that time, Defendants were refusing to provide accessible PDF ballots to voters with print disabilities.  (*Id.* at 3.)  Lou Ann Blake, the Deputy Director of the National Federation of the Blind Blindness Initiatives, submitted a declaration stating that, "[a]s a general matter, by using Adobe, making an existing PDF ballot 'readable' (for individuals with print disabilities who use screen readers such as Job Access With Speech ('JAWS')) and 'fillable' (meaning that bubbles appearing within the PDF can be filled in electronically in order to indicate a selection made by the user) is straightforward."  (Dkt. No. 8-8 ¶ 15.)  She noted that "other options are available to New York in the long term" but that "making the current PDF ballot for military and overseas voters accessible and available to voters with print disabilities would improve access to absentee voting for people with disabilities in the short term."  (*Id.* ¶ 18.)  The relief sought by the May 22, 2020 motion was confined to the June 23, 2020 election.  (Trans. of 5.22.2020 Hearing at 6.)

On June 2, 2020, the parties reached a stipulation regarding absentee voting procedures for the June 23, 2020 election (the "June Stipulation").  (Dkt. No. 38.)  The June Stipulation was

expressly "without prejudice to the assertion of any claims, arguments, contentions and defenses

whether or not otherwise alleged in the Complaint." (*Id.* at 2.)  It also provided that nothing

therein would be "deemed an admission by either party." (*Id.*)  The June Stipulation provided, in

relevant part, as follows:

> Defendants agree to instruct county boards of elections to provide by email an
> accessible fillable PDF absentee ballot ("accessible absentee ballot") to voters
> who have a disability that prevents them from privately and independently using a
> paper absentee ballot.
>
> Defendants agree to announce the new accessible absentee ballot program in a
> press release and on the NYSBOE website by June 3, 2020.
>
> Defendants agree to issue written mandatory instructions on or before
> Wednesday, June 3, 2020 that comprehensively instruct county boards of
> elections how to 1) provide the accessible absentee ballot request form on their
> respective websites, 2) process accessible absentee ballot requests, and 3) deliver
> and receive accessible absentee ballots.
>
> Defendants agree that voters may submit an electronic request for an accessible
> absentee ballot at any time up until June 16, 2020, seven (7) days prior to the June
> 23, 2020 Elections.
>
> Defendants agree to instruct county boards of elections to make available to the
> voter an accessible absentee ballot "as soon as practicable" upon the voter's
> request, pursuant to N.Y. Election Law § 8-406.
>
> Defendants agree that upon receipt of a voter's request for an accessible absentee
> ballot, county boards of elections or their agents will, pursuant to mandatory
> directive of the NYSBOE, generate a ballot that is screen readable using common
> assistive technology, such as Job Access with Speech "JAWS" software, Apple
> VoiceOver, and Android TalkBack, which shall include insertion of tags and
> fillable objects so that it can be completed independently and privately by the
> requesting individual using standard, accessible technology, namely a screen
> reader program. The accessible absentee ballot shall meet WCAG 2.0 AA
> standards for a PDF.
>
> Defendants agree that it will instruct county boards of elections that the ballot will
> be accompanied with accessible instructions on how to return the ballot, including
> instructions to place the ballot in an envelope and sign the back of the envelope.
>
> Defendants agree that this Stipulation pertains only to the June 23, 2020 Primary
> Election, and that this Stipulation does not apply to any subsequent elections or

resolve issues that may remain in Plaintiffs' Complaint.

Within 45 days after the June 23, 2020 Primary Election, Defendants shall publish a publicly-available report containing the following information: a. The number of individuals with disabilities who requested an accessible absentee ballot; b. The number of individuals who were provided an accessible absentee ballot; and c. Descriptions of any complaints or feedback received from voters with disabilities regarding accessible absentee ballots and descriptions of how any complaints were resolved.

In consideration for entering into this Stipulation, Plaintiffs hereby agree to withdraw their PI/TRO Motion.

(*Id.*)

On July 9, 2020, the Court received a letter from Plaintiffs requesting a briefing schedule for a new preliminary injunction motion addressing the matter of accessible absentee ballots for the November 3, 2020 general election.  (Dkt. No. 49.)  The Court granted the application, which provided for a response to be due on August 7, 2020 and which did not provide for any reply brief.  (Dkt. No. 50.)  The Court set a preliminary injunction hearing for August 11, 2020.  (*Id.*)

Pursuant to the proposed schedule, Plaintiffs filed their second motion for a preliminary injunction.  (Dkt. No. 55.)  On August 3, 2020—before Defendants filed their response— Plaintiffs sought leave to file a reply brief with supplemental facts in support of their preliminary injunction motion.  (Dkt. No. 68.)  Specifically, Plaintiffs hoped to submit additional expert testimony regarding the technology they were asking Defendants to adopt for the November election.  Following a conference with the parties, the Court permitted Plaintiffs to submit any additional facts no later than August 6, 2020 and extended Defendants' deadline to respond to the preliminary injunction motion until August 10, 2020.  (Dkt. No. 72.)  Plaintiffs were permitted to file a reply brief by August 11, 2020 and the preliminary injunction hearing was reset to August 13, 2020.  (*Id.*)  The Court invited testimony from any witness that either side

wished to call.  (Dkt. Nos. 85, 91.) [2]  Each side rested at the end of the hearing. (Trans. of 8.13.2020 Hearing at 93–94.)  The Court also invited and has considered five-page supplemental briefs from each side addressing the evidence at the hearing.[3]  (Dkt. Nos. 95, 96, 98, 99.)[4]

Plaintiffs' live preliminary injunction motion seeks to require Defendants to implement an effective and purpose-built RAVBM system for use across New York State for the November 3, 2020 election.  (Dkt. No. 56 at 1.)[5]  With RAVBM systems, the voter is not delivered a PDF by the local county board of elections that has to be read by a screen reader.  Rather, the local board of elections sends raw ballot data to a vendor and the vendor then produces an accessible HTML ballot from that raw data.  The ballots are "created and delivered" in a "fully screen-reader compatible" format, permitting the voter to mark the ballot in HTML.  (Dkt. Nos. 74, 76, 92.)  The ballot is converted into an accessible PDF only when it comes time to print.  (Dkt. No. 76 ¶ 6.)

Plaintiffs emphasize that an RAVBM system can produce accessible ballots for every potential voter in advance, unlike the measures established by the June Stipulation, which tried to remediate existing documents after a request for an accessible absentee ballot was made.  (*Id.*)  Plaintiffs also note that an RAVBM system can ensure that the ballots are compatible with all of the common assistive software and operating systems used by people with print disabilities.  (*Id.*)

---

[2] The Court also ensured that no party objected to the hearing being conducted telephonically with the presiding judge located outside the District.  (Dkt. Nos. 85, 90.)
[3] Plaintiffs asked the Court to take judicial notice of additional evidence in their letter.  (Dkt. No. 96.)  That request is improper and the Court will not receive the evidence.  The evidence, which is submitted for the truth of the matter asserted therein, is not subject to judicial notice and the Court closed the hearing on August 13, 2020.  However, in an excess of caution, the Court has reviewed the evidence.  Even if it were admissible, it would not change the Court's findings or conclusions.
[4] The Court accepts Dkt. No. 98 as Plaintiffs' letter-brief.
[5] Plaintiffs express no opinion regarding whether New York State should offer multiple RAVBM systems or only one.  (Dkt. No. 56 at 1 n1.)  Nor do they seek an order compelling the NYS BOE to procure an RAVBM from a specific vendor.

They have listed several potential RAVBM systems including Prime III, Democracy Live, Five Cedars, Dominion, and Maryland's online ballot marking system. (*Id.* at 8; Dkt. No. 78 at 14– 15.)

The motion asserts that Individual Plaintiffs and members of the Organizational Plaintiffs faced substantial challenges when attempting to cast their votes on June 23, 2020 using the remediated ballot system. (*Id.* at 2.) For evidentiary support, Plaintiffs have offered declarations from eight voters residing in New York City or four other counties of New York:

- **Justin Young (Dkt. No. 58).** Young is a resident of Monroe County. He complains about the process for receiving his absentee ballot. At first, he encountered difficulty filling out the application for an absentee ballot because instructions were located at the bottom of the page rather than the top, so he did not come across them while filling out the form using his screen reading software. Later, when he called the Monroe County Board of Elections (any Board of Elections is hereinafter abbreviated "BOE"), the representative did not know that accessible absentee ballots existed and transferred him to another representative, who told Young that "there was no such thing as an email ballot in New York," notwithstanding the fact that accessible PDF ballots are necessarily conveyed via email. When Young called back on a later date, he experienced a similar situation. He "went in circles" with the representative who ultimately told him that she "had no idea" what he was talking about. Young received three absentee ballots—two standard ballots in the mail and one accessible ballot via email. Ultimately, he was ultimately able to complete the ballot and vote electronically.

- **Maria Kristic (Dkt. No. 59).** Kristic is a resident of Albany County. She successfully submitted an accessible absentee ballot application but the ballot she received was not fully accessible with her screen reader. She found lists of the delegates via Google on third-party websites to identify the names of those for whom she wished to vote. Kristic encountered confusion with the printing instructions but was ultimately able to print and mail the ballot herself. Still, due to the technological issues, she asked her father to double-check the printed ballot.

- **Meghan Parker (Dkt. No. 60).** Parker, like Kristic, is a resident of Albany County and had difficulty with the ballot generated by Albany County. The ballot did not link any information connecting the delegates with the candidate or party those delegates were supposed to represent. The ballot also would read out choices she had already heard or give only a few choices when she knew there were more. Ultimately, she gave up and used sighted assistance to fill out her ballot.

- **Keith Gurgui (Dkt. No. 63).** Gurgui is a resident of Ulster County. He requested and received an accessible absentee ballot electronically from the Ulster County BOE. He was

able to mark it using his computer.  But he received assistance from his father to take the printed ballot from the printer, sign the BOE-provided oath envelope, fold the ballot, insert the folded ballot into the oath envelope, insert the oath envelope into the BOE-provided mailing envelope, and drop the absentee ballot in the mail.  He would require a fully online absentee ballot system (including electronic ballot submission) in order to vote privately and independently.

- **Robin Mayr (Dkt. No. 65).**  Mayr is a resident of Suffolk County.  She had difficulty completing the accessible absentee ballot application due to accessibility issues.  She tried for nearly an hour but was unable to address the problem.  Ultimately, her husband completed the application for her using his iPad.  After submitting the application, she did not receive any confirmation that it had been received by the Suffolk County BOE.  When she called to inquire, the representative had "never heard of accessible absentee ballots."  The following week, someone called her back and told her that the application had been received but that it would not open.  Her husband resent the application.  After that, the Suffolk County BOE representative confirmed that it had been received.  Mayr received an absentee ballot but it also had accessibility issues.  The software could not tell her which candidate was associated with which check box, so she could not cast her vote privately.   Her husband had to fill out a paper absentee ballot for her so that she could cast her vote.

- **Karen Luxton Gourgey (Dkt. No. 62).**  Gourgey is a resident of New York City.  She applied for, and was sent, a link to the primary accessible absentee ballot.  It came up as an HTML that was easy to fill out with her JAWS screen reader.  But her computer is not connected to a printer.  She had expected the absentee ballot to be an accessible PDF file that she could save and attach to an email or transfer to a USB drive.  If that had been the case, she would have been able to print it from her husband's computer, which does not have screen reader software, but is connected to their printer.  But she could not figure out how to save the accessible absentee ballot because it was not a PDF file.  She called the New York City BOE but they could not help her.  Ultimately, her husband filled out the accessible absentee ballot on his computer while she dictated her choices to him.  If she had understood what file format would be used for her accessible absentee ballot, she would have planned differently by downloading a trial version of JAWS onto her husband's computer, so that she could have completed and printed the absentee ballot privately and independently.

- **Jose Hernandez (Dkt. No. 64).**  Like Gurgui, Hernandez is a resident of New York City who requested and received an accessible absentee ballot electronically from the New York City BOE, which he marked and printed at home.  However, he received assistance from his aid worker to take the printed ballot from the printer, sign the oath envelope, insert the folded ballot into the oath envelope, insert the oath envelope into the mailing envelope, and drop the ballot in the mailbox.  In order to vote privately and independently, Hernandez needs a system that includes electronic ballot submission.

- **Rasheta Bunting (Dkt. No. 66).**  Bunting is also a resident of New York City, who experienced significant difficulties filling out and submitting an application for an accessible absentee ballot.  It took her nearly an hour because every time she typed a letter, she had to listen to the software read through the entire application before she could type the next letter.

She never received confirmation that her application was received.  When election day came, she still had not received a ballot.  She decided to walk with her daughter to the nearest polling station and cast her vote in-person, despite the fact that she was concerned about doing so in light of the fact that she lives with her parents who are senior citizens with chronic health conditions.[6]

Defendants oppose implementation of an RAVBM system.  They do not dispute that they have an obligation to provide an accessible absentee voting system for individuals with print disabilities.  But they insist that the procedures in the June Stipulation, along with certain "key improvements" they will make (which, together with the June Stipulation, are hereinafter called the "Proposed Measures"), satisfy that obligation.  (Dkt. No. 79 at 1.)  The "key improvements" are: (1) preparing accessible ballots at the time ballots are created to avoid the need for cumbersome, time-consuming "retrofitting," and (2) providing additional guidance and training to county boards in implementing the accessible ballots.  (*Id.*; Dkt. No. 95.)  With respect to (1), Defendants clarified at oral argument that the counties will be required to generate a ballot that is screen readable using common assistive technology, which will include insertion of tags and fillable objects so that it can be completed independently and privately by the requesting individual using standard, accessible technology, namely a screen reader program, and which will meet WCAG 2.0 AA standards for a PDF, *in advance of* any request being made by a voter for such ballot.  (Trans. of 8.13.2020 Hearing at 47.)  In other words, each one of New York's 58 counties will prepare in advance a ballot that is screen readable using common assistive technology, regardless whether that county received a request in connection with the June primary and regardless whether it can expect to receive such a request in connection with the November general election.  Defendants challenge the technical feasibility, monetary costs, and

---

[6] Defendants do not dispute any of the facts recited by these declarants but they assert that New York City has no record of Bunting applying for an absentee ballot.  (Trans. of 8.13.2020 Hearing at 71.)

personnel utilization costs of an RAVBM system.  (Dkt. No. 79 at 20.)

The Court has now received full written briefing and oral argument from both sides.  It has also received declarations from both sides.  The Court also heard live testimony, under oath, from Thomas Connolly, Director of Operations for NYS BOE.  Both sides had the opportunity to examine Connolly and to present any other witnesses they desired to present.  Having considered the motion, the relevant facts, and the applicable law, the following constitutes the Court's ruling, which incorporates its findings of fact and conclusions of law.

## LEGAL STANDARDS

A preliminary injunction is an "extraordinary remedy."  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).  Ordinarily, a movant must show: (1) irreparable harm absent injunctive relief; (2) a likelihood of success on the merits; (3) public interest weighing in favor of granting the injunction; and (4) that the balance of equities tips in her favor.  *Yang v. Kosinski*, 960 F.3d 119, 127 (2d Cir. 2020).[7]  "But where the movant is seeking to modify the status quo by virtue of a *mandatory* preliminary injunction (as opposed to seeking a *prohibitory* preliminary injunction to maintain the status quo), or where the injunction being sought will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits, the movant must also: (1) make a strong showing of irreparable harm, and (2) demonstrate a clear or substantial likelihood of success on the merits."  *Id.* at 127–28 (internal quotation marks and citation omitted).  Moreover, where movants seek a mandatory injunction against government action taken pursuant to a valid statutory scheme, they must demonstrate all of the following factors: (1) a clear or substantial likelihood of success on

---

[7] When the Government is a party, it is appropriate to consider the third and fourth factors "together."  *New York v. United States Dep't of Homeland Sec.*, 2020 WL 4457951, at *30 (2d Cir. Aug. 4, 2020).

the merits; (2) irreparable harm absent the granting of injunctive relief; and (3) that the public

interest weighs in favor of granting the injunction.  *See Pope v. County of Albany*, 687 F.3d 565,

570 (2d Cir. 2012); *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d

133, 143 (2d Cir. 2016).[8]

"In order to establish a violation under the ADA, the plaintiffs must demonstrate that (1)

they are 'qualified individuals' with a disability; (2) that the defendants are subject to the ADA;

and (3) that plaintiffs were denied the opportunity to participate in or benefit from defendants'

services, programs, or activities, or were otherwise discriminated against by defendants, by

reason of plaintiffs' disabilities."  *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003)

(citing *Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir. 1998)).  "Because Section 504 of the

Rehabilitation Act and the ADA impose identical requirements," courts "consider [such] claims

in tandem."  *Rodriguez v. City of New York*, 197 F.3d 611, 618 (2d Cir. 1999).

The ADA's implementing regulations provide that "[a] public entity shall operate each

service, program, or activity so that the service, program, or activity, when viewed in its entirety,

is readily accessible to and usable by individuals with disabilities."  28 C.F.R. § 35.150.  Further,

they direct that:

> (b)(1) [a] public entity shall furnish appropriate auxiliary aids and
> services where necessary to afford individuals with disabilities . . . an *equal*
> *opportunity* to participate in, and enjoy the benefits of, a service, program, or
> activity of a public entity . . . [and that]

---

[8] Defendants argue that Plaintiffs face a heightened burden of persuasion on all of the elements
for the injunction they seek because of the unique posture of their request (a mandatory one
sought close in time, on a preliminary record, that would affect voting procedures).  (Dkt. No. 79
at 11 (citing *Veasey v. Perry*, 135 S. Ct. 9, 10 (2014) ("[C]ourts must take careful account of
considerations specific to election cases."); *Purcell v. Gonzalez*, 529 U.S. 1, 4–5 (2006);
*Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020)); Dkt. No. 95
at 5.)  Plaintiffs disagree.  (Dkt. No. 56 at 10.)  The Court need not resolve that dispute because
the result described herein would obtain even if Defendants' proposed heightened standard did
not apply.

(b)(2) [i]n determining what types of auxiliary aids and services are
necessary, a public entity shall give *primary consideration* to the requests of
individuals with disabilities. In order to be effective, auxiliary aids and services
must be provided in accessible formats, in a timely manner, and in such a way
as to protect the privacy and independence of the individual with a disability.

28 C.F.R. § 35.160 (emphases added);[9] *see Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494,

505 (4th Cir. 2016) (deeming 28 C.F.R. § 35.160 relevant to Title II challenge to an absentee

voting program); *Crowder v. Kitagawa*, 81 F.3d 1480, 1483 (9th Cir. 1996) (Title II violation

occurs when government action "burdens visually-impaired persons in a manner different and

greater than it burdens others"); *see also Moody ex rel. J.M. v. NYC Dep't of Educ.*, 513 F.

App'x 95, 96 (2d Cir. 2013) ("optimal accommodations" not required) (internal quotation marks

and citation omitted).

"Primary consideration" means Defendants "must honor [Plaintiffs'] choice, unless

[Defendants] can demonstrate that another equally effective means of communication is

available or that the aid or service requested would fundamentally alter the nature of the

program, service, or activity or would result in undue financial and administrative burdens."

United States Dep't of Justice, *ADA Update: A Primer for State and Local Governments* 8

(2015), https://www.ada.gov/regs2010/titleII_2010/titleII_primer.pdf (hereinafter, "DOJ

Primer").

"It is abundantly clear that Defendants are obligated to provide a level of access to their

voting program beyond the simple assurance that voters with disabilities are able to cast a ballot

in some way, shape, or form." *United Spinal Ass'n v. Board of Elections in City of New York,*

---

[9] Within the ADA, "there is an express delegation of authority" to the United States Attorney
General to promulgate regulations necessary to its implementation, 42 U.S.C. § 12134(a), and
therefore those regulations are entitled to "controlling weight, unless they are arbitrary,
capricious, or manifestly contrary to the statute." *Chevron, U.S.A., Inc. v. Nat. Res. Def.
Council, Inc.*, 467 U.S. 837, 843–44 (1984).

882 F. Supp. 2d 615, 623 (S.D.N.Y. 2012).  Put differently, plaintiffs "need not . . . prove that

they have been disenfranchised or otherwise 'completely prevented from enjoying a service,

program, or activity' to establish discrimination under Section 504 or Title II."  *Disabled in

Action v. Bd. of Elections in City of New York*, 752 F.3d 189, 198 (2d Cir. 2014) (quoting *Shotz

v. Cates*, 256 F.3d 1077, 1080 (11th Cir. 2001)).  The "relevant inquiry" is "whether those with

disabilities are as a practical matter able to access benefits to which they are legally entitled," *id.*

(citing *Henrietta D.*, 331 F.3d at 273), and the "relevant benefit is the opportunity to fully

participate in BOE's voting program," *id.*  "This includes the option to cast a *private* ballot on

election days."  *Id.* (citing N.Y. Elec. Law § 5–601) (emphasis added).[10]

The Fourth Circuit has held, and this Court agrees, that where, as here, a challenge is

lodged to the accessibility of a widely-available absentee voting program, the "relevant public

service or program at issue" is not the "voting program in its entirety" but rather the "absentee

voting program."  *Lamone*, 813 F.3d at 503 (explaining why an analytic scope encompassing the

entire voting program would be "overbroad and would undermine the purpose of the ADA and

its implementing regulations"); *see Hindel v. Husted*, 875 F.3d 344 (6th Cir. 2017) (holding

same); *Drenth v. Boockvar*, 2020 WL 2745729, at *5 (M.D. Pa. May 27, 2020) (same);

*Democracy N.C. v. N.C. State Bd. of Elections*, 2020 WL 4484063, at *56 (M.D.N.C. Aug. 4,

---

[10] *Disabled in Action* held that, "[b]y designating inaccessible poll sites and failing to assure their
accessibility through temporary equipment, procedures, and policies on election days, BOE
denies plaintiffs meaningful access to its voting program."  752 F.3d at 199.  The State had
argued that it "offer[ed] individuals with disabilities reasonable accommodation by transferring
individuals from inaccessible to accessible polling sites," but the Second Circuit characterized
that argument as stemming from a "misunderstand[ing]" of "BOE's affirmative obligations
under the statutes and the nature of the accommodations that plaintiffs [sought]."  *Id.*  The
Second Circuit highlighted the lack of factual support for the BOE's accommodation, noting
that, "while the policy of reassigning voters to accessible polling sites could theoretically
constitute a reasonable accommodation, there is nothing in the record to support that it provides
meaningful access to individuals with disabilities."  *Id.* at 201 n.13.

2020) (same).  The text of Title II compels close examination not just of broad public

"programs" but of "services, programs, *or* activities."  42 U.S.C. § 12132 (emphasis added).  It

not only prohibits "exclusion from participation" but "den[ying] the benefits" of those services,

programs, or activities.  *Id.*

Significant to the analysis is that New York has chosen to make absentee voting broadly

available to the electorate.  The New York State legislature has adopted, and the Governor is

expected to sign, several bills that will make absentee balloting widely available in the State of

New York.  Among those bills are:

- S. Res. 8015—D, 2020 Leg., 2019–2020 Sess. (N.Y. 2020), which will permit a voter to obtain an absentee ballot if the voter is unable to appear personally at a polling place because there is a risk of contracting or spreading a disease-causing illness to the voter or to other members of the public;
- S. Res. 8783—A, 2020 Leg., 2019–2020 Sess. (N.Y. 2020), which would allow absentee ballot applications to be sent to a county board of elections by letter, fax or use of a board of elections portal earlier than 30 days before an election;
- S, Res. 8730—B, 2020 Leg., 2019–2020 Sess. (N.Y. 2020), which establishes procedures for a voter to cure deficiencies when a local board of elections receives an invalid absentee ballot affirmation envelope; and
- S. Res. 8799—A, 2020 Leg., 2019–2020 Sess. (N.Y. 2020), which permits absentee ballots that do not have postmarks but are received by the board of elections by the day after the date of the election to be canvassed, thereby addressing the instances where, due to mechanical error or error at the post office, an absentee ballot does not receive a postmark.

For purposes of this motion, over no objection by the parties, the Court treats these bills

as though they will be signed by the Governor and become law in advance of the November

election.  (Trans. of 8.13.2020 Hearing at 29–30.)  In these circumstances, it would be intolerable

and legally incorrect to conclude that the relevant service, program, or activity is voting

generally and not absentee voting particularly.  Such a definition would, in effect, permit the

State to require persons with disabilities, and only persons with disabilities, to hazard the risks of

COVID-19 to cast a private ballot.  *See Alexander v. Choate*, 469 U.S. 287, 301 (1985) ("The

benefit itself, of course, cannot be defined in a way that effectively denies otherwise qualified

handicapped individuals the meaningful access to which they are entitled.").

A public entity is not required to make modifications that "fundamentally alter the nature of the service, program, or activity," 28 C.F.R. § 35.130(b)(7)(i) or "impose an undue hardship on the operation of [the] program," *id*. § 41.53. "Determination of the reasonableness of a proposed modification is generally fact-specific." *Lamone*, 813 F.3d at 508.

## DISCUSSION

**Clear or Substantial Likelihood of Success on the Merits**

The parties do not dispute that Plaintiffs are individuals with qualified disabilities or that Defendants are subject to the ADA. Defendants have also assumed they have an obligation to make an accommodation to permit those with disabilities to cast a private ballot, as those without disabilities are able to cast a private ballot. At issue is whether Plaintiffs have established a clear or substantial likelihood of success on the merits of their claim that NYS BOE must adopt an RAVBM system to satisfy its obligation to "operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities," 28 C.F.R. § 35.150, and to "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an *equal opportunity* to participate in, and enjoy the benefits of, a service, program, or activity of a public entity," 28 C.F.R. § 35.160 (emphasis added). Specifically, the question is whether—giving "primary consideration" to the instant requests of those with disabilities—Plaintiffs have established that their proposed means of communication would be effective in providing individuals with disabilities an equal opportunity to participate in New York's absentee ballot program (which means the ability to cast a ballot privately and independently) or whether, contrariwise, there is reason to believe that Defendants will be able to demonstrate that "another equally effective

16

means of communication is available."  DOJ Primer.  In the alternative, Defendants can attempt

to prove a likelihood "that the aid or service requested would fundamentally alter the nature of

the program, service, or activity or would result in undue financial and administrative burdens."

*Id.*[11]

    After careful consideration, the Court concludes that Plaintiffs have not met their burden

of showing a clear or substantial likelihood of success on the merits.  To be sure, Plaintiffs have

offered extensive evidence—which the Court finds credible—that an RAVBM system generally

and in most instances can operate effectively to ensure that a person with disabilities receives an

accessible ballot that he or she can cast privately.  Karl Groves, an expert for Plaintiffs,

submitted an opinion that "commercial RAVBM systems used elsewhere in the United States

have been tested for compatibility with both state voting systems and with all available screen

reader technology in combination with multiple permutations of operating systems and web

browsers."  (Dkt. No. 75 ¶ 19.)  "Furthermore," he explained, "the vendors who provide these

systems are able to provide immediate assistance rectifying any issues that arise, as they are

experienced in Information Technology Accessibility issues."  (*Id.*)  Blake testified that RAVBM

systems, which "import . . . raw ballot data from the jurisdiction—not a PDF ballot—and display

---

[11] At oral argument, Plaintiffs stated the applicable standard as follows: "[U]nless the defendants
can demonstrate that another system is as equally effective as the RAVBM system, then they are
legally required to consider and implement the RAVBM system here because that's what the
plaintiffs' primary choice is."  (Trans. of 8.13.2020 Hearing at 26.)  Defendants disagree with
that articulation.  (Dkt. No. 95 at 4.)  They assert that "Plaintiffs' choice of a remedy is [not]
mandated, merely because plaintiffs have chosen it."  (*Id.*)  It is correct that public entities are
not mandated to select the remedy chosen by a person with a disability, simply because that
person chose that remedy, in all circumstances and without any say in the matter.  By choosing a
remedy, a person with a disability triggers two options for a public entity: either it can "honor"
that choice or it can identify "another equally effective means of communication."  DOJ Primer.
That is the only interpretation that accords with the plain text of the DOJ Primer.  *See* DOJ
Primer ("[Public entities] must *honor* [the individual's] choice, unless [the entity] can
demonstrate that another equally effective means of communication is available . . . .").

it to the voter in HTML format" are "inherently more accessible." (Dkt. No. 76 ¶ 6.) Her declaration lists several jurisdictions that have used commercial RAVBM systems. Another of Plaintiffs' experts, Juan Gilbert, who has published more than 250 articles and who has received more than $28 million in research funding, testified to his knowledge that RAVBM tools "are effective." (Dkt. No. 74 ¶ 16.)

The question in this case, however, does not end with whether the RAVBM technology generally, and in those other locations, would be effective in permitting a person with disabilities to cast an absentee ballot independently and privately. The NYS BOE would not be required to direct each of the 58 counties to adopt such a system if there was, for that county, an "equally effective" means of communication to permit such casting of a ballot. Although the question is close, the Court concludes that Plaintiffs have not made a showing of clear or substantial likelihood that they will prevail on that issue.

In that respect, two points are relevant. First, as demonstrated by the evidence submitted by Plaintiffs themselves, the RAVBM system is not fail-safe. New York City used Democracy Live—an RAVBM system—for the June election. (Trans. of 8.13.2020 Hearing at 12–13.) And three out of the eight voter declarations from Plaintiffs, which were submitted in support of an application to require implementation of an RAVBM system, come from New York City voters. Their testimony reveals that an RAVBM system, just like Defendants' Proposed Measures, has shortcomings. Hernandez, an individual with limited dexterity, would need to be able to submit his ballot electronically in order to vote privately and independently. (Dkt. No. 64.) But Plaintiffs are not seeking an injunction requiring individuals with disabilities to be able to submit their ballots electronically. (Trans. of 8.13.2020 Hearing at 26 ("[W]hat we are talking about for November only is electronic requests and delivery with a mail-in return.")). Therefore, the

proposed RAVBM system would not address his needs.  Gourgey, another New York City voter, had trouble saving her ballot because it was *not* a PDF file.  (Dkt. No. 62.)  Her testimony suggests that, had the ballot been an accessible PDF, she could have saved it and attached it to an email or transferred it to a USB drive, and printed it from her husband's computer independently.  (*Id.*)  The RAVBM system did not address her needs.  The third New York City voter is Bunting, who for reasons apparently unknown, did not receive a ballot.  (Dkt. No. 66.)  The RAVBM system did not serve her needs either.

Second, from the limited evidence presented in connection with the preliminary injunction hearing, the Court cannot say that Defendants would be unsuccessful in their defense that the Proposed Measures would be equally effective as an RAVBM.  Put another way, there is good reason to believe that Defendants will be able to show that their measures are equally effective.  With the exception of New York City, the county BOEs used an accessible PDF absentee ballot marking system in connection with the June elections.  And, although Plaintiffs rightly complain about the instances where that system failed or had weaknesses, the record before the Court supports the conclusion that the ballot marking system worked in a large number of instances.  There were 131 accessible absentee ballots issued in connection with the June election—67 to voters in New York City and 64 to voters outside New York City.  (Dkt. No. 78, Ex. C.)[12]  New York City, as mentioned, has contracted with a RAVBM vendor.  The proposed injunction would not redress any issues identified in New York City.

For the counties outside of New York City, the evidence does not establish the existence

---

[12] Absentee ballots were not issued where the applicant was found to be ineligible either because there was no primary for the voter's party or the voter was not registered to vote.  In addition, in New York City, 42 applications for absentee ballots were not filled because the applications were "incomplete," seemingly reflecting premature submissions or technical glitches.  (Dkt. No. 78, Ex. C.)  There were no incomplete applications outside of New York City.  (*Id.*)

of systemic issues with the accessible PDF absentee ballot marking system.  That evidence does show that the ballots in Albany County and, perhaps in Suffolk County, were configured in a manner that made them difficult to read.  (Dkt. Nos. 59, 60, 65.)  In Albany County, the delegates were not linked with their presidential candidates, the heading for the District Attorney race was not in the right place, and the reading order of the candidates on the local primary ballot was wrong.  (Dkt. No. 69 ¶¶ 12–13.)  Once a voter made a selection on the ballot, she could not use the arrow key to move through the ballot anymore.  (Dkt. No. 60 ¶ 13.)  The ballot would read out choices the voter had already heard or give the voter a choice of only a few delegates when the voter knew there were more.  (*Id.*)  The printing instructions were also confusing. (Dkt. No. 69 ¶ 14.)  In Suffolk County, a voter found that the software could not tell the voter which candidate was associated with each check box.  (Dkt. No. 65 ¶ 15.)  But, those are only two of the many counties outside of New York City.  There is no evidence of such problems elsewhere and no evidence to suggest that the problems encountered by Albany and Suffolk Counties were inherent to the approach taken by NYS BOE.  Instead, they appear to be the idiosyncratic result of an approach that was rushed and *ad hoc* in connection with the June primary but that presumably (and based on Defendants' representation) will be more deliberate and more carefully planned in advance of the November election.[13]  In fact, Young in Monroe County and Gurgui in Ulster County were each able to complete the accessible absentee ballot themselves without incident.  (Dkt. No. 58; Dkt. No. 63).  No evidence was submitted with

---

[13] Plaintiffs' expert, Groves, studied the Albany ballots and determined that "whoever performed the work of attempting to make the PDFs in Exhibits C and D (the ballots) accessible did not understand accessibility or the process of converting a standard PDF to an accessible PDF." (Dkt. No. 75 ¶ 15.)  Groves does not suggest that the PDF platform itself is incompatible with accessible absentee voting.  Rather, he testified that "[a] person creating such documents must have both a depth and breadth of understanding of the PDF format, tagging, object identification, and how PDF documents are rendered by assistive technologies."  (*Id.* ¶ 17.)

respect to other counties.

Moreover, the Court credits Connolly's testimony that the problems with the ballot in Albany County, which were a function of the rushed timetable between the June Stipulation and the June election, can and will be avoided with longer lead time, greater scrutiny in vendor selection, and increased accessibility consulting.  (Trans. of 8.13.2020 Hearing at 70–71.)  Specifically, Connolly explained that, "with more lead time," NYS BOE will "require each ballot style with a different ballot configuration to be made accessible at its creation, as opposed to as an *ad hoc* process."  (Dkt. No. 78 ¶ 24.)  He promised "greater consistency and quality control" by "limit[ing] the use of authorized vendors allowed to make the ballots accessible" and he promised that the BOE "will provide more detailed instructions to the vendors that make the ballots accessible about the associations that need to be made in the accessible PDF."  (*Id.* ¶ 25.)

Defendants thus represented to the Court, on the record and under oath at oral argument, that they will implement every measure in the June Stipulation plus the above-described improvements.  The Court accepts that representation.

To be sure, several of Plaintiffs' voter-declarants encountered problems obtaining and processing a ballot *application*, as opposed to an actual ballot.  That testimony is of concern.  But the RAVBM solution Plaintiffs ask the Court to order would not address it.  RAVBM is fundamentally a ballot marking technology, not a technology that would change how ballot applications are processed.  Although there was testimony that NYS BOE or county BOEs could purchase an add-on service of application processing (Trans. of 8.13.2020 Hearing at 8), Plaintiffs' application is plainly focused on *ballot* accessibility.  (*See* Dkt. No. 56 at 2 ("Because Defendants did not put into place a purpose-built RAVBM system to provide *ballots* that were designed to be accessible, the CBOEs took wildly different approaches, leading to a variety of

errors.") (emphasis added); *id.* ("A RAVBM system can produce accessible *ballots* for every potential voter in advance, rather than try to remediate existing documents after a request is made.") (emphasis added); *id.* ("It can ensure that the *ballots* are compatible with all of the common assistive software and operating systems used by people with print disabilities.") (emphasis added); *id.* at 2–3 ("It can deliver the *ballots* electronically to voters with print disabilities and allow them to electronically mark their ballots.") (emphasis added).)

Additionally, several declarants identified, essentially, customer service error—BOE representatives who were not helpful or even knowledgeable about accessible absentee voting. The Court is not persuaded that such errors would be better or worse between an RAVBM system and the Proposed Measures. Defendants largely attribute this problem to inadequate training, which they have pledged to remediate. Plaintiffs argued that this issue could be improved with a link on a county BOE website, directing voters seeking accessible absentee ballots to contact a representative from the RAVBM vendor. But there is no evidence that the (presumably, non-local) RAVBM vendor would have the capacity to provide more immediate and better-trained assistance than a properly trained county BOE office does.

On the whole, after a full trial, Plaintiffs would not be likely to prevail against a defense that the Proposed Measures are equally effective to an RAVBM system. Plaintiffs have not met their burden of showing a clear or substantial likelihood of success on the merits.

**Irreparable Harm**

Defendants do not dispute that the deprivation of the right of a single individual to cast a ballot independently and privately would work irreparable harm. The right to vote is, of course, of constitutional magnitude. U.S. Const. Amend. XV; *Reynolds v. Sims*, 377 U.S. 533, 562 (1964). It is the right that is "preservative of all rights." *Reynolds*, 377 U.S. at 562. Although

the Supreme Court has yet to recognize a constitutional right to vote in private, *see Thompson v. Dorchester Cty. Sheriff's Dep't*, 2007 WL 5681972, at *8 (D.S.C. May 4, 2007), *aff'd*, 280 F. App'x 328 (4th Cir. 2008), the Court has called it "necessary to cure electoral abuses," *Burson v. Freeman*, 504 U.S. 191, 207 (1992), and, "[s]ince 1895, [the New York] Constitution has specifically provided that, whether voting is by ballot or another method prescribed by law, 'secrecy in voting be preserved.'" *Kosmider v. Whitney*, 132 N.E.3d 592, 602 (quoting N.Y. Const. Art. II, § 7). Once a voter has been forced to reveal her choice for office, that revelation cannot be taken back; the loss is not something that can be repaired by money damages. *Cf. Green Party of N.Y. State v. N.Y. State Bd. of Elections*, 267 F. Supp. 2d 342, 351 (E.D.N.Y. 2003), *modified*, 2003 WL 22170603 (E.D.N.Y. Sept. 18, 2003), *and aff'd*, 389 F.3d 411 (2d Cir. 2004) (finding that plaintiffs had "satisfied the [irreparable harm] prong of the test by alleging" that aspects of a voter enrollment program violated "their First and Fourteenth Amendment rights to express their political beliefs, to associate with one another as a political party, and to equal protection of the law").

However, to support a preliminary injunction, the harm must not only be irreparable but loss of the right must also be "actual and imminent," and not speculative or remote. *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009); *see also id.* (calling the "showing of irreparable harm" the "single most important prerequisite for the issuance of a preliminary injunction"). Given the mandatory nature of the injunction sought, the Court must specifically consider whether Plaintiffs have made "a strong showing of irreparable harm." *Yang*, 960 F.3d at 127–28 (internal quotation marks and citation omitted).

Plaintiffs argue that they have demonstrated a likelihood of actual and imminent harm because "Defendants lack a concrete plan for improving on their performance" and "have not

taken the first step of instructing the county boards of elections to remediate their PDF ballots for the November 3 election, much less provided guidance on an appropriate process, quality control, or funding for the remediation." (Dkt. No. 98 at 1.) They assert that, absent their requested injunction, their right to vote independently and privately will be compromised.

The Court cannot agree that Plaintiffs have made a strong showing of a risk of irreparable harm that is actual and imminent. Defendants have represented that they will implement the Proposed Measures, including directing each of the county BOEs or their agents, regardless whether they have previously received a request, to generate a ballot that is screen readable using common assistive technology, such as Job Access with Speech "JAWS" software, Apple VoiceOver, and Android TalkBack, which shall include insertion of tags and fillable objects so that it can be completed independently and privately by the requesting individual using standard, accessible technology, namely a screen reader program.[14]

By order of this Court they will be required to do so. Thus, for the reasons above, describing why the Court construes the Proposed Measures to satisfy Defendants' obligations under the ADA, the Court finds that they would not actually and imminently not deprive Plaintiffs of the opportunity to vote privately and independently. To be sure, elections are not risk-free endeavors. Even unrelated to accessibility measures, the logistics of an absentee voting program threaten imperfect execution. But on the present record, Plaintiffs have failed to make a strong showing that such threats are more than "remote" or "speculative." *Faiveley*, 559 F.3d at 118.[15]

---

[14] The accessible absentee ballot shall meet WCAG 2.0 AA standards for a PDF.
[15] The Court's finding rests on the record before it presently, which has many gaps and ambiguities. It leaves open the possibility that, upon a fuller record, Plaintiffs could show that the Proposed Measures deprive voters with disabilities the access to which they are constitutionally entitled. The same possibility applies to the likelihood-of-success and public

**Public Interest and Balance of Equities**

Plaintiffs also have failed to show that the "public interest weigh[s] in favor of granting the [requested] injunction." *Thomas v. New York City Bd. Of Elections*, 898 F. Supp. 2d 594, 597 (S.D.N.Y. 2012).

Even if, in the abstract and in isolation, an "RAVBM tool offers Plaintiffs and their members the best opportunity to cast a private and independent vote" (Dkt. No. 98 at 4), and would redress the problems confronted by Albany County (and perhaps Suffolk County) in the June election, and even if an RAVBM system has been implemented in New York City, the Court cannot ignore that there are 55 other counties in New York State.

Unlike other states in which the voting system is centralized, New York has a "bottom-up" system, meaning that "the individual county boards are the registrars of voters, produce and mail ballots, and are individually responsible for canvassing and counting their own ballot returns and votes." (Dkt. No. 77 ¶ 3.)  Each county has a different subsystem for accomplishing those tasks. (*Id*.)  And in any given election, each county has many different ballot styles. (Trans. of 8.13.2020 Hearing at 58; *see also id*.)  An RAVBM system, according to Connolly, would require each county, as an in-house effort, to import data into the RAVBM system and then do necessary quality control on "hundreds, if not thousands, of unique ballot styles" to ensure that the system "will provide the correct information to the voter." (Trans. of 8.13.2020 Hearing at 76.)  Moreover, in many instances, each county BOE would have to do so without IT staff or employees who have been trained to work with such a vendor.  They would need to seek additional assistance. (*Id.* at 37.)  It took New York City—with a budget of $123,000,000 and a staff of 517 employees—fourteen days to work with a vendor to transmit to it the necessary

interest/balance-of-equities prongs.

25

information for it to be able to generate an RAVBM ballot.  (Dkt. No. 78 ¶ 40; Trans. of 8.13.2020 at 32.)  It would take countless additional days for the remaining New York counties—which *collectively* have a budget of $116,000,000 and a total of 691 employees—to work with a vendor to implement a system and make sure it was checked for quality control. (*Id.*)  The Court asked Connolly why that process would take more time than the steps necessary to implement the Proposed Measures.  Connolly's answer was clear: the "actual work" of the Proposed Measures would done by outside vendors, rather than by the county BOEs in-house. (*Id.* at 69.)  Once the county BOEs generate the ballot PDFs as they would in ordinary course, they send them to an outside vendor for remediation.  (*Id.*)  By contrast, the technical information migration required by an RAVBM system would have to be done in-house and would require the expertise to do so.  (*Id.*)

Moreover, NYS BOE, for its part, would need to "examine, review and make modifications to an already burdened system to accept this new type of request, as well as create a new repository for the new ballot type."  (Dkt. No. 77 ¶ 6.)  The various types of testing required of these changes (functional testing, communications testing, load testing, security testing, as well as accessibility testing) would pose significant logistical challenges in light of the applicable time constraints.  (*Id.* ¶¶ 8–9.)

In sum, introducing an RAVBM "would be a time-consuming and pain-staking process." (*Id.* ¶ 3.)  Moreover, it would be a time-consuming and pain-staking process that would divert resources from other programs and activities that NYS BOE and county BOEs are undertaking at a crucial time when the county BOEs are trying to manage an election in the middle of a paralyzing global pandemic and are resource-strapped.

None of that might matter much if the Court were convinced that the RAVBM system

was necessary to assure those with disabilities the right to a private vote on a statewide basis or even in large portions of the state.   But the Court is not so convinced.   Here, it has evidence from two counties—out of 58 in the State of New York—of problems from June that could promisingly be remediated by an RAVBM system.   The Court does not diminish the significance of those problems for the voters involved; they have as great a right to a private vote as any citizen of New York.   In particular, it agrees with Plaintiffs who, in answer to the Court's question at oral argument whether, "if a ballot works for 1,000 people, [but] doesn't work for the 1,001st person, then [have] you established irreparable harm," (Trans. of 8.13.2020 Hearing at 18), answered yes and that irreparable harm is not "a numbers game."  (*Id.* at 22.)  By the same token, however, the Court needs to consider the risk that counties where accessible PDF ballots worked in June (that is, counties where individuals with disabilities were able to cast private and independent ballots) would fail to achieve the same result if they tried to implement an entirely new system now; from the evidence before the Court, that is a significant possibility.   The Court must also consider the hardship on each of the 58 counties, and thereby on the State, as they labor to ensure that all citizens have the ability to cast a private vote, of implementing a new system statewide in order to redress problems identified only in a few counties.   Weighing those factors, on the present record, the risks and resource diversion threatened by an RAVBM system outweigh its benefit compared to the Proposed Measures.

## CONCLUSION

For the reasons above, Plaintiffs' motion for preliminary injunction requiring the State to implement an RAVBM system statewide is DENIED.   In accordance with this Opinion & Order, and to ensure that Plaintiffs are able to cast private and independent votes, and to vindicate their rights under the ADA and the Rehabilitation Act, however, the Court orders Defendants to

submit a proposed injunction consistent with Defendants' written and oral representations

regarding implementation of an accessible absentee voting system for the November 3, 2020

election.  Defendants shall meet and confer with Plaintiffs regarding the terms of that injunction.

The parties shall submit a proposed injunction order to the Court no later than 5:00 p.m. on

August 17, 2020.

       The Clerk of Court is respectfully directed to close Dkt. No. 55.

Dated: August 14, 2020
       New York, New York
                                 LEWIS J. LIMAN
                         United States District Judge